**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GERRY MOBLEY, JR., | : | CIVIL NO: 1:14-CV-00615 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Caldwell) |
| v. | : | |
| | : | |
| JAMES BARNACLE, *et al*., | : | |
| | : | (Magistrate Judge Schwab) |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

In this civil action, proceeding *via* an amended complaint, the *pro se* plaintiff, Gerry Mobley, Jr. ("Mobley"), currently an inmate at SCI Greene raises federal constitutional claims against employees of the Pennsylvania Department of Corrections ("DOC") pursuant to 42 U.S.C. § 1983. In addition, Mobley raises state-law tort claims. Mobley's claims in this lawsuit primarily stem from his imprisonment at SCI Huntingdon. Currently pending is the defendants' partial motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Our recommendations follow.

## I.   Relevant Procedural History.

On April 1, 2014, Mobley initiated this lawsuit by filing a complaint. *Doc.* 1. Along with the complaint, Mobley filed a motion to proceed *in forma pauperis* that we granted. *Docs.* 2 & 9. On September 17, 2014, Mobley filed an amended complaint of right and named the following seven defendants: (1) James Barnacle

("Barnacle"), the DOC's Director for the Office of Special Intelligence and Investigation ("OSII"); (2) Tabb Bickell ("Bickell"), the former Superintendent at SCI Huntingdon; (3) Caleb Younker ("Younker"), a Corrections Sergeant at SCI Huntingdon; (4) James Booher ("Booher"), a Corrections Officer at SCI Huntingdon; (5) Andrew Nickum ("Nickum"), a Corrections Office at SCI Huntingdon; 6) FNU Myers, a Corrections Officer at SCI Huntingdon; and (7) FNU Reed, a Misconduct Hearing Examiner at SCI Houtzdale. *Doc.* 8.  According to Mobley, he sues Barnacle and Bickell in their official and individual capacities, while he solely sues the remaining defendants in their individual capacities. Generally, in his amended complaint, Mobley asserts First, Eighth, Fourth, and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983.  As well, Mobley raises intentional tort claims pursuant to Pennsylvania state law.  On January 14, 2015, the defendants waived service, *Doc.* 11, and, on February 23, 2015, they filed a partial motion to dismiss[1] that is ripe for the Court's disposition.  *Docs.* 16, 17 & 19.

## II.   <u>Legal Standard.</u>

Defendants' partial motion to dismiss is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(6) authorizes dismissal of a

---

[1]   The defendants do not move to dismiss Count V against Nickum, which alleges a failure to intervene; nor do they move to dismiss Count XI, which alleges assault and battery against Younker and Myers.  The defendants also do not move to dismiss portions of other Counts, which we will note accordingly.

complaint for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).  While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, and a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoted case omitted).

In resolving a motion to dismiss, we thus "conduct a two-part analysis." *Fowler, supra*, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. *Id.* at 210–11. Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoted case omitted).

While traditionally focused upon the allegations contained in a complaint, a court may also consider exhibits attached to a complaint, matters of public record, and "an undisputedly authentic document" relied upon by the plaintiff and attached as an exhibit to a defendant's motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, in a case such as this, a complaint filed by a *pro se* litigant is to be liberally construed and held to a less stringent standard than formal complaints drafted by a lawyer. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

## III.   Mobley's Amended Complaint.[2]

In the amended complaint, Mobley begins by discussing an earlier case he had filed against employees at SCI Huntingdon, *Mobley v. Snyder*, 1:13-CV-00772 (M.D. Pa.), of which this Court is familiar. Mobley's other lawsuit, which is also still active, involved constitutional claims for retaliation, inadequate medical care, and violations of due process against employees at SCI Huntingdon. Among the individuals named as defendants there were Bickell, Booher, and Nickum. On June 7, 2013, prior to service on the named defendants, the undersigned screened

---

[2]   Consistent with the Rule 12(b)(6) legal standard, *supra,* we will accept Mobley's properly pleaded allegations as true.

4

Mobley's pleading pursuant to 28 U.S.C. § 1915A and recommended, in pertinent part, that the Court dismiss the claim against Bickell without prejudice. The undersigned did not specifically address the claims against Nickum and Booher; instead, the undersigned found that the claim(s) against those defendants, at minimum, survived the screening analysis. One week after the undersigned's recommendations were filed is where Mobley's present lawsuit begins.

On June 11, 2013, as mail was being distributed to the inmates, Booher went to Mobley's corner cell on the second tier of the Restricted Housing Unit ("RHU") at SCI Huntingdon and a "dialogue" between the two men commenced. First, Booher said to Mobley, "your punk ass still hiding in this corner cell!" *Doc.* 8 at ¶ 17. In response, Mobley stated, "whatever, you're the punk. I will report you for you [sic] calling me out my [sic] name and cursing at me." *Id.* at ¶ 18. Booher then stated "I don't give a fuck about you or your lawsuit. You gotta [sic] win it first," *id.* at ¶ 19, to which Mobley said, "[M]an you were the one who denied me medical care. I'll write you up for harassing me. I can file all the lawsuits I want." *Id.* at ¶ 20. In an angry tone, Booher got the last word in on Mobley by referencing an alleged attack on another inmate that required the inmate to be sent to a hospital for life-threatening injuries. According to Mobley, Booher insinuated that he (Booher) was the one who attacked the other inmate. Mobley, who only heard about the alleged attack, did not see it or know whether Booher had any

involvement with it.  Mobley, having heard of the alleged attack on the other inmate, however, inquired about whether Booher was making a threat against him. Booher responded to Mobley's inquiry by stating that he would send Mobley "out on life flight." *Id.* at ¶ 25.  Booher then walked away from Mobley's cell.

   After Booher walked away, Mobley reported the perceived threat to OSII and addressed his report to Barnacle.  Mobley explained that Booher had made references to the other inmate that was allegedly attacked and sent outside of the prison for medical treatment.  *See Doc.* 1 at 29-30; *Doc.* 8 at ¶ 27. While Mobley admits in the amended complaint that he has no personal knowledge of what happened to the other inmate, he nevertheless wrote to Barnacle in the report that the inmate was attacked by Younker, in addition to other non-defendant DOC employees.  *Id.*  Despite the fact that Mobley referenced Younker in his OSII report, he solely expressed his fear that he was in danger from Booher.  *Id.* Mobley did not reference any threats from other DOC employees. *Id.*  Last, in the same report, Mobley explained how Booher was named as a defendant in his other federal lawsuit.  *Id.*  On June 28, 2013, Barnacle responded to Mobley's written report by stating that it did not "meet the criteria under DC ADM 001," nor did it meet the requirement of a formal OSII inquiry.  *Id.* at ¶ 29; Doc. 1 at 28.  Barnacle informed Mobley, however, that he would forward the report to Bickell for his review.  *Id.*

On June 18, 2013, while Mobley's OSII report was pending review by Barnacle, Mobley was sitting in his cell eating breakfast when a non-defendant corrections officer served him with a misconduct charge for using obscene, abusive, or inappropriate language to an employee and for also threatening another person during the early morning hours. The misconduct report was written by Nickum.  Mobley, however, did not have any contact, conversation, or interaction with Nickum on the date in question.

Nearly one month later, on July 12, 2013, Mobley was informed by a non-defendant DOC employee that he was going to be moved to a new cell assignment. Mobley, thus, was ordered to pack his property and be ready to move.  That same evening, Myers and Younker went to where Mobley was housed before he changed cells.  Younker ordered Myers to handcuff Mobley behind his back.  A tether was also attached to the handcuffs.  According to Mobley, the handcuffs and tether were unauthorized under the circumstances, pursuant to prison policy DC-ADM 201.  Nevertheless, as Mobley arrived to his new cell assignment still in handcuffs and linked to a tether, Younker asked Mobley, "you running your mouth to OSII?" *Id.* at ¶ 42.  Mobley replied that he did not understand the question.  Myers, however, began bending Mobley's left wrist, to which Mobley said "it's not gonna (sic) to work." *Id.* at ¶ 45.  Thereafter, Nickum, Myers, and Younker surrounded Mobley and confronted him about "running [his] mouth" with respect to the inmate

7

who was allegedly assaulted by a DOC employee. Nickum subsequently shouted "Now!" *Id.* at ¶ 49. At that moment, Myers yanked the tether connected to Mobley's handcuffs, smashing the metal cuffs into his wrists. Mobley fell off balance when the tether was pulled. Moreover, as he was losing his balance, Mobley felt a "blow" to the back of his head and neck, causing him to feel dizzy. After the blow was delivered, Mobley was "dumped" chest first into an area described as a "partition," where Younker and Myers then begin "beating him up" with fists, elbows, and knees. *Id.* at ¶¶ 52-53. At one point during the attack, Younker told Myers to break Mobley's wrists. *Id.* at ¶ 54. Nickum stood by without providing Mobley any assistance or otherwise attempting to stop the attack. As the attack started to cease, Younker told Mobley that he "bet [Mobley] would keep [his] mouth shut now." *Id.* at ¶ 56.

In all, the alleged attack lasted between one and two minutes, and, according to Mobley, amounted to an unjustified use of force under prison policy DC-ADM 201. Also, during the incident, Younker was the ranking officer on duty. Among his responsibilities, Younker had a duty to provide safety to inmates. Younker also had a duty to ensure that the corrections officers he supervised followed prison policy.

After the alleged attack, Mobley was escorted to a "strip cage." Mobley felt pain in his chest, head, neck, and wrists. He also felt as though he needed to

receive Nitroglycerin.  Mobley does not explain why he needed to receive it.  To date, Mobley feels pain in his wrist, preventing him from holding certain objects, suffers from emotional distress and anxiety, and has nightmares.

On the same date he was allegedly attacked, Mobley was eventually put back into his prison uniform, placed in handcuffs, and escorted to his new cell assignment without any of his personal property.  While Mobley was in his new cell, Booher approached.  Booher made similar comments to Mobley as he had on the previous day.  As we liberally construe the amended complaint, Booher also allegedly told Mobley that he had informed Younker about the report sent to OSII. Mobley then began threatening to file further lawsuits.  In relevant part, Booher responded that he was keeping Mobley's personal property.  Thereafter, Booher and a non-defendant corrections officer left with Mobley's property.  Later, Mobley received a misconduct charge authored by Myers for assaulting a staff member, using obscene language, and refusing to obey an order.

Two days after the alleged attack occurred, Mobley's personal property was returned to him.  In addition, Mobley was transferred from SCI Huntingdon to SCI Houtzdale on July 23, 2015.

Upon his arrival at SCI Houtzdale, Mobley appeared for a misconduct hearing in front of Reed, on the misconduct charges he had received while detained at SCI Huntingdon.  Mobley pleaded not guilty to those misconduct charges.  After

making a statement, Mobley requested witnesses to testify on his behalf at the hearing. Reed, however, denied Mobley's request. Reed, instead, authored a report of his findings in which he provided that he watched a video of the incident from three angles, which all tended to support the misconduct charges filed against Mobley by a preponderance of the evidence. As a consequence, Mobley was sanctioned with 90 days of "disciplinary status." *Doc.* 8 at ¶ 158. Mobley claims that, overall, Reed was biased and prejudice against him and denied him a fair hearing. Further, Mobley takes issue with Reed's findings and the fact that, contrary to prison policy, i.e., DC-ADM 201, the use of force allegedly used against him was never reported.

Mobley further complains that Bickell, who was the Superintendent at SCI Huntingdon at the time in question, had the responsibility to train, supervise, and discipline corrections officers to ensure compliance with prison policies such as the policy on use of restraints, use of force, the prohibition on retaliation, and falsifying misconduct reports; however, Bickell, according to Mobley, did not satisfy his responsibilities. Mobley also plainly alleges that Bickell's alleged failures as a supervisor caused the alleged attack on him. In relevant part, Mobley alleges that Bickell could have abated the risk of harm to him had he acted on the OSII report regarding the threats made by Booher. To that end, without supporting allegations, Mobley alleges that Bickell actually received the OSII report from

Barnacle.  Moreover, on information and belief, Mobley alleges that Bickell had knowledge of "other occasions" when DOC policy was not followed by corrections officers, including Younker, Nickum, Myers, and Booher.

In a similar vein, Mobley complains that Barnacle had a responsibility to take immediate action to abate harm to him after his report of a perceived threat by Booher was filed with OSII.   According to Mobley, Barnacle "knew" of "numerous occasions," spanning the course of several years, where corrections officers at SCI Huntingdon engaged in conduct that violated DOC policies and the Constitution.

Based upon these allegations, Mobley raises the following 12 Counts: (1) Count I: a violation of the First Amendment against Booher; (2) Count II: a violation of the First Amendment against Nickum; (3) Count III: a violation of the Eighth Amendment for "fail[ing] to act" against Bickell and Barnacle; (4) Count IV: a violation of the Eighth Amendment, for using excessive force, against Younker and Myers; (5) Count V: a violation of the Eighth Amendment, for failing to intervene, against Nickum; (6) Count VI: a violation of the First Amendment against Myers; (7) Count VII: a violation of the Fourth Amendment against Booher; (8) Count VIII: a violation of the Fourteenth Amendment's Due Process Clause against Reed; (9) Count IX: a violation of the Eighth Amendment, for acting with a deliberate indifference to risk of harm, against Booher, Barnacle,

11

Bickell, Myers, Younker, and Nickum; (10) Count X: a violation of the Eighth Amendment for failing to train and supervise, against Younker and Bickell; (11) Count XI: state-law claims for assault and battery against Younker and Myers; and (12) Count XII: a state-law claim for intentional infliction of emotional distress against Booher, Nickum, Bickell, Barnacle, Younker, Myers, and Reed.   For remedies, Mobley seeks compensatory and punitive damages in addition to declaratory and injunctive relief.  With respect to Mobley's request for declaratory relief, he specifically seeks a declaration that his constitutional rights were violated.   Regarding his request for injunctive relief, Mobley seeks to receive therapy for his wrist while in the custody of the DOC and to never be imprisoned at a state institution where any of the named defendants are employed.

**IV.   Discussion.**

**A. Mobley's Federal Claims.**

Mobley's federal claims are brought pursuant to 42 U.S.C. § 1983.   In pertinent part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"Section 1983 is not a source of substantive rights, but merely a method to

vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002)). To establish a claim under § 1983, a plaintiff must show that (1) the conduct complained of was committed by persons acting under color of state law and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). The Third Circuit has also explained: "[t]he first step in evaluating a [S]ection 1983 claim is to identify the exact contours of the underlying right said to have been violated and to [then] determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013)(*en banc*)(internal quotations and quoted case omitted).

Defendants do not dispute that the amended complaint includes sufficient allegations plausibly suggesting that they are state actors. Our focus, therefore, is to identify the exact contours of the underlying federal rights said to have been violated and to then determine whether Mobley has plausibly alleged a deprivation of such rights.

### 1. Eleventh Amendment Immunity.

Before delving into the substance of Mobley's federal claims, we must first address an issue that touches on our subject-matter jurisdiction. *See Hans v.*

*Louisiana*, 134 U.S. 1, 15-16 (1890); *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000); *Lombardo v. Pennsylvania*, 540 F.3d 190, 194–95 (3d Cir. 2008); *Johnson v. U.S. Attorneys*, CIV. A. 10-1643, 2010 WL 2991409, at *2-*3 (E.D. Pa. July 27, 2010).  In this regard, Bickell and Barnacle argue that the claims against them in their official capacities for retrospective monetary damages should be dismissed with prejudice pursuant to Eleventh Amendment sovereign immunity. *Doc.* 17 at 5-6.

Under the Eleventh Amendment to the United States Constitution, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. Amend. XI. In addition, the Eleventh Amendment protects unconsenting states and state agencies from suit brought in federal court brought against them by their *own* citizens.  *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009).  When lawsuits are brought against state officials in their official capacities for retrospective monetary relief, those lawsuits are generally treated as suits against the state.  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991). Thus, unless the state consents, the Eleventh Amendment, *via* Eleventh Amendment sovereign immunity, bars such suits against a state in federal court.

*Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-01, 104 S.Ct. 900, 908-09 (1984). This is true regardless of whether such a suit is brought under federal law, *Seminole Tribe v. Florida*, 517 U.S. 44, 54, (1996), or state law, *Pennhurst, supra*, 465 U.S. at 117.

Here, in the absence of express consent by the Commonwealth, or argument by Mobley to otherwise convince us that Eleventh Amendment immunity is inapplicable, we agree that any claims for retrospective monetary damages raised against Barnacle and Bickell, in their official capacities, should be dismissed with prejudice. Any claims for monetary damages, generally, against Barnacle and Bickell in their individual capacities, however, should be allowed to presently stand.

### 2. Mobley's Requests for Declaratory and Injunctive Relief.

In addition to a monetary award, Mobley seeks declaratory and injunctive relief. The defendants, however, argue that since Mobley is presently confined at SCI Greene, not at SCI Huntingdon or SCI Houtzdale, where the alleged violations of law occurred, his request for declaratory and injunctive relief should be dismissed as moot.

In resolving this issue, it is well-recognized that the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). "The rule in federal

cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 459 n. 10 (citations omitted). "Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects." *Rosenberg v. Meese*, 622 F.Supp. 1451, 1462 (S.D.N.Y. 1985) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Thus, a prisoner's transfer or release from prison moots his claims for injunctive or declaratory relief because he is no longer subject to the conditions he alleges are unconstitutional. *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003); *Abdul–Akbar v. Watson*, 4 F.3d 195, 206–07 (3d Cir. 1993).

At the time this lawsuit was filed, Mobley had already been transferred to SCI Greene.  Moreover, Mobley does not allege that his rights are being similarly violated at SCI Greene; that he is being denied medical treatment for his alleged wrist injury while there; that there is a reasonable probability that he will be returned to either SCI Huntington or Houtzdale; or that there is a reasonable probability that he will be transferred to any other institution within the Commonwealth where the primary defendants are employed.  As such, we agree that Mobley's claims for injunctive and declaratory relief should be dismissed as moot.  *See Anderson v. Showalter*, No. 14-330, 2015 WL 1285957, at *7-*8 (M.D. Pa. Mar. 20, 2015)(dismissing plaintiff's claim for declaratory relief as moot).

16

### 3.  First Amendment Retaliation – Counts I, II, and VI.

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.   A First Amendment retaliation claim generally requires "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).   "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).   Moreover, "the key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *Thomas,* 463 F.3d at 296 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)).

In Counts I, II, and VI, Mobley raises a First Amendment retaliation claim against Booher, Nickum, and Myers, respectively.  As we view Mobley's amended complaint, said retaliation claims relate solely to the filing of his previous federal lawsuit in this Court, not to any subsequent grievances or investigation reports he may have also filed.  To that end, these defendants do not dispute that Mobley's filing of a lawsuit is to be considered constitutionally protected conduct, nor do we view the defendants as arguing that Mobley fails to allege that the alleged conduct qualifies as a sufficiently adverse action.  Rather, these defendants rest their argument for dismissal on the causation element, arguing that it would be "absurd" to conclude that they were even aware of Mobley's lawsuit in June 2013, at the time when the alleged conduct occurred.  In other words, these defendants contend that Mobley's previously filed federal lawsuit could not possibly have been the motivation for the alleged conduct.

In accepting the allegations in Mobley's amended complaint as true, we disagree that Booher lacked knowledge of the federal lawsuit that Mobley had previously filed in this Court.   Indeed, Mobley alleges that Booher made statements that he knew precisely about the lawsuit.   Coupled with the simultaneous timing of Booher's alleged threats to Mobley, we have little difficulty finding that Mobley has stated a claim for relief under the First Amendment, for retaliation, with respect to Booher.  Count I, therefore, should

proceed.

We find, however, that Mobley has failed to state a First Amendment claim against Nickum and Myers.  To that end, Mobley's allegations fail to sufficiently demonstrate that they had knowledge of the previously filed federal lawsuit; instead, his allegations on this point are conclusive.  Further, while Nickum and Myers might have had knowledge of Mobley's written report to OSII on June 12, 2013, there are no allegations plausibly suggesting that through the same report they also learned about the other federal lawsuit.  As well, it is true, as the defendants point out, that Mobley's pleading in the other federal lawsuit was not served on any defendants until after the dates at issue in this case.  That alone, however, does not mean that it was impossible for them to have otherwise learned of the lawsuit; rather, it is supportive evidence in light of the present allegations in Mobley's amended complaint weighing against his claim for relief.  Thus, absent sufficient allegations plausibly suggesting that Nickum and Myers had knowledge of the other federal lawsuit, we find that Mobley fails to state a First Amendment retaliation claim against them, for he has failed to demonstrate that the lawsuit was cause for the alleged adverse actions taken against him.  Accordingly, Counts II and VI should be dismissed without prejudice.

### 4. Eighth Amendment "Failure to Act" – Count III.

In Count III, Mobley alleges that Defendants Bickell and Barnacle violated the Eighth Amendment by "failing to act" in the face of his report to OSII that Booher had threatened him, to abate the risk of harm to him that allegedly occurred during the attack.

Regardless of how Mobley intends this claim for relief, *compare Doc.* 17 at 8, *with Doc.* 19 at 10, in order to generally plead an Eighth Amendment claim, a prisoner-plaintiff must plausibly show that prison officials acted with deliberate indifference to an inmate's health and safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In order to satisfy the deliberate indifference standard, it must be alleged that a prison official both "knew[ ] of and disregard[ed] an excessive risk to inmate health or safety." *Id*. at 837. The deliberate indifference standard outside of the context of an excessive-force claim, is subjective rather than objective, "meaning that the official must actually *be* aware of the existence of excessive risk; it is not sufficient that the official *should* have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (emphasis added).

Here, Mobley's Eighth Amendment claim in Count III should be dismissed. The OSII report mentioned a perceived threat from Booher to cause Mobley harm. The same report did not mention that other employees, such as Nickum, Myers, or Younker, also threatened him. Furthermore, other than alleging that Booher

threatened him on a second occasion, Mobley does not claim that Booher used excessive force against him or acted on the perceived threats.  As well, while the OSII report may have included Mobley's personal beliefs or opinions about what had happened to the other inmate that was supposedly attacked by someone other than Booher, that information alone is inadequate to have provided Bickell and Barnacle with subjective awareness of any risk of harm to Mobley at the alleged hands of Younker, Myers, and Nickum.   Indeed, even assuming Mobley was correct, that Younkers allegedly attacked the other inmate, there was nothing in the OSII report, or in the amended complaint for that matter, to otherwise suggest that Bickell and Barnacle were aware that Booher and Younker might have been acting in concert.  As such, whatever harm Mobley may have endured after the OSII report was filed, at the hands of persons other than Booher, Barnacle and Bickell did not have subjective prior knowledge of a risk of harm to Mobley.  Thus, Mobley fails to state an Eighth Amendment claim against Bickell and Barnacle in Count III, and we conclude that this claim should be dismissed without prejudice.

### 5. Fourth Amendment Unreasonable Search and Seizure – Count VII.

In Count VII, Mobley alleges that he endured a Fourth Amendment violation when Booher seized personal property from his cell and refused to return it until a later date.  Inmates, however, do not have a reasonable expectation of privacy in their prison cells; thus, they are not protected by the constitutional prohibition

21

against unreasonable searches and seizures.  *See Hudson v. Palmer*, 468 U.S. 517 (1984).  Accordingly, to the extent Mobley still wishes to include this claim against Booher, *see Doc.* 19 at 12, we recommend that it be dismissed with prejudice.

### 6. Fourteenth Amendment Procedural Due Process  – Count VIII.

In Count VIII, Mobley claims that defendant Hearing Examiner Reed denied him with procedural due process in connection with his disciplinary hearing at SCI Houtzdale.  The Fourteenth Amendment, in part, provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. Amend. XIV.  A due process claim requires a two-part analysis.  First, a court must determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn,* 213 F.3d 140, 143 (3d Cir. 2000).  Second, if the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it."  *Id.*

In *Sandin v. Conner,* 515 U.S. 472 (1995), the United States Supreme Court, addressing the question of when the state can create liberty interests protected by the Due Process Clause, held that:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant

hardship on the inmate in relation to the ordinary incidents of
prison life.

*Id.* at 483–84.

In *Sandin,* the inmate was sentenced to 30 days of disciplinary confinement

in the Special Holding Unit.  As a result of the inmate's disciplinary segregation he

"had to spend his entire time alone in his cell (with the exception of 50 minutes

each day on average for brief exercise and shower periods, during which he

nonetheless remained isolated from other inmates and was constrained by leg irons

and waist chains)."  *Id.* at 494 (Breyer, J., dissenting).  The Court concluded that

the inmate's 30 days in the Special Holding Unit, considered within the context of

prison confinement, did not impose the type of atypical and significant deprivation

of liberty in which the state could be seen to have created a liberty interest.  *Id.* at

486.  The Court noted that disciplinary confinement at the prison in question, with

only insignificant exceptions, mirrored conditions imposed on inmates in

administrative and protective custody; that based on a comparison of inmates

inside of and outside of disciplinary segregation, placement in segregation for

thirty days did not work a major disruption in the inmate's environment; that

disciplinary action did not inevitably affect the duration of the inmate's sentence;

and that the "regime to which [the inmate] was subjected was within the range of

confinement to be normally expected for one serving an indeterminate term of 30

years to life."  *Id.* at 486–87.

"After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin,* 545 U.S. 209, 223 (2005) (quoting *Sandin,* 515 U.S. at 484).  In deciding whether a protected liberty interest exists under *Sandin,* we consider the duration of the confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn,* 318 F.3d 523, 532 (3d Cir. 2003).  Whether a protected liberty interest exists under *Sandin* requires inquiry into the specific facts of the case, *Id.* at 533, but, "inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest." *Burns v. Pennsylvania Dept. of Corrections,* 642 F.3d 163, 171 (3d Cir. 2011).

In this case, Mobley alleges that at the disciplinary hearing at SCI Houtzdale, Reed sanctioned him with 90 days "disciplinary status."  Assuming Mobley means that he was sanctioned with time spent in administrative custody, this amount of time does not, in itself, amount to an atypical and significant hardship, qualifying as a liberty interest protected by the Due Process Clause. *See Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven months of disciplinary confinement was not an atypical and significant hardship); *see also*

*Williams v. Bitner*, 307 F. App'x 609, 610-11 (3d Cir. 2009) (holding that a sanction of 90 days in disciplinary custody was insufficient to trigger a due process violation); *Alford v. Laquise*, 2015 WL 1260141, at *1 (3d Cir. 2015).   Thus, Count VIII should be dismissed with prejudice.

### 7. Eighth Amendment Deliberate Indifference – Counts IV and IX.

In Count IX, Mobley claims that Younker and Myers violated the Eighth Amendment by using excessive force on him during the alleged attack in July 2013.   Similarly, in Count IV, as we understand it, Mobley claims that all of the defendants named in this lawsuit acted with deliberate indifference, in violation of the Eighth Amendment, by disregarding the risk of harm to him, i.e. the use of excessive force.

Based on our understanding of the two Counts, we see no difference in what Mobley separately pleads.   Furthermore, Mobley does not oppose the defendants' request in their brief-in-support, *see Doc.* 17 at 10, to have the two Counts consolidated into a single Count, as a claim for excessive force in violation of the Eighth Amendment.   As such, we agree with the defendants, and first recommend that the two Counts be consolidated with each other. *See also,* M.D. Pa. L.R. 7.6.

Simultaneously, we also agree with the defendants that Barnacle and Bickell should be dismissed in the combined Count since there are no allegations that they played an affirmative part in or had any personal involvement with the alleged

excessive use of force in July 2013.  *See Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2005)(discussing personal involvement as an element to a § 1983 claim); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)(same); *Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077 (3d Cir. 1976).  The combined Count, should therefore be dismissed without prejudice as to Barnacle and Bickell.[3]

With respect to Booher, however, we disagree that there are no sufficient allegations to plausibly suggest that he had an "affirmative part" with the alleged use of excessive force.  Not only did Booher allegedly threaten Mobley before the alleged attack occurred, but, after the incident, Mobley alleges that Booher essentially confessed that he had been the one to tell Younkers about Mobley's OSII report.  Furthermore, Booher's alleged comments after the alleged attack, as set forth in Mobley's amended complaint, *Doc*. 8 at ¶ 66, give further rise to a reasonable inference that he, at minimum, acquiesced in the use of excessive force and otherwise did nothing to prevent it from happening.  Thus, the consolidated count for excessive force should proceed against all defendants, save Bickell and Barnacle.

---

[3]     The defendants do not argue that Younker, Nickum, or Myers should be dismissed from Count IV, and we do not make any recommendations of the kind with respect to them here.

### 8. Eighth Amendment Failure to Train and Supervise – Count X.

In Count X, Mobley claims that Younker and Bickell, in their supervisory capacities, caused constitutional harm to befall him.  To that end, Mobley asserts that Younker and Bickell failed to train, supervise, and discipline the DOC employees under their watch, when it came to prison policies relating to the use of restraints, use of force, retaliation, and the fabrication of misconduct reports. Moreover, Mobley claims that Younker and Bickell were aware of, acquiesced in, tolerated, and encouraged violations of the same prison policies.  Only Bickell moves for the dismissal of Count X.

According to Bickell, this claim should be dismissed because Mobley fails to allege sufficient facts to show that he was aware of prior incidents of misconduct or violations of prison policy in that Mobley does not provide specific examples.

As touched on previously, a "defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*." *Evancho,* 423 F.3d at 353 (3d Cir. 2005) (quoting *Rode,* 845 F.2d at 1207). Individual liability can only be imposed if the state actor played an "affirmative part" in the complained-of misconduct. *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir.1986). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and

acquiescence." *Argueta v. U.S. ICE,* 643 F.3d 60, 72 (3d Cir.2011) (quoting *Rode,* 845 F.2d at 1207).

Alternatively, there are two theories of supervisory liability under § 1983. The first theory may be applied when the "[the supervising official] participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995)). The second basis arises when the supervisor, as a policymaker, has acted "with deliberate indifference to the consequences [of his or her actions], [and] established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M.*, 372 F.3d at 586 (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Additionally, the absence of an underlying constitutional violation usually precludes any supervisory liability on a "knowledge or acquiescence" or "failure to train" theory. *Crawford v. Lappin*, 446 F. App'x 413, 416 (3d Cir. 2011) (nonprecedential); *Argueta,* 643 F.3d at 72.

In his amended complaint, Mobley does not adequately allege that Bickell, in his supervisory role as an alleged policymaker at SCI Huntingdon, established and maintained policies, customs, or practices which directly caused the alleged constitutional harm to befall Mobley. Indeed, as Bickell points out, while Mobley

claims that Bickell was aware of "other incidents," he does not explain what those incidents entailed such that a plausible nexus could be formed with the alleged harm that befell him to hold Bickell liable in a supervisory capacity. Furthermore, as we have already addressed, *supra,* there are no allegations plausibly suggesting that Bickell took an affirmative part in the alleged constitutional misconduct, and, for present purposes, there are no allegations that he participated in, had knowledge of, acquiesced in, encouraged, or directed the alleged misconduct. Consequently, the supervisory liability claim against Bickell in Count X should be dismissed without prejudice.

### B. Mobley's State-Law Claims.

Jurisdictional issues aside**,** Mobley raises two state-law intentional tort claims. In Count XI, Mobley alleges that Younker and Myers should be held liable for intentional assault and battery in connection with the alleged attack. In Count XII, Mobley raises a claim for intentional infliction of emotional distress against all named defendants. Defendants solely move for the dismissal of Count XII as it relates to Booher, Barnacle, Bickell, and Reed. More precisely, these defendants move for dismissal of Count XII on the basis of sovereign immunity provided by Pennsylvania law.

The Pennsylvania General Assembly, after the judicial abolition of sovereign immunity by the Pennsylvania Supreme Court in *Mayle v. Pa. Dep't of*

*Highways*, 388 A.2d 709 (1978), reaffirmed by statute the concept of immunity for

the Commonwealth and its employees. The statute reads:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 Pa. C.S. § 2310.

According to the plain language of the statute, not only the Commonwealth,

but also its employees and officials are entitled to immunity.  *See also, Moore v.

Commonwealth*, 538 A.2d 111, 115 (Pa. Commw. Ct. 1988).   Moreover, the

General Assembly has expressed only nine exceptions to the grant of sovereign

immunity. The exceptions are based on acts of Commonwealth employees.

Specifically, the defense of sovereign immunity shall not be raised to claims

caused by: (1) the operation of any motor vehicle in the possession or control of a

Commonwealth party; (2) acts of health care employees of Commonwealth agency

medical facilities or institutions or by a Commonwealth party who is a doctor,

dentist, nurse or related health care personnel; (3) the care, custody or control of

personal property in the possession or control of Commonwealth parties; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) a dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements; (6) the care, custody or control of animals in the possession or control of a Commonwealth party; (7) the sale of liquor at Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; or (9) the administration, manufacture and use of a toxoid or vaccine.. *See* 42 Pa. C.S. § 8522.

The proper test to determine if a Commonwealth employee is protected from liability pursuant to the sovereign-immunity defense under § 2310 is to consider (1) whether the Commonwealth employee was acting within the scope of his or her employment; (2) whether the alleged act which causes injury was negligent and damages would be recoverable but for the availability of the immunity defense; and (3) whether the act fits within one of the nine exceptions to sovereign immunity. *See La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).

In this case, no one disputes that the relevant defendants are employees of the Commonwealth.  Next, a state official is considered to be acting within the scope of his employment if his "[c]onduct . . . . is of a kind and nature that the

31

employee is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the employer." *See Larsen v. State Employees' Retirement System*, 553 F.Supp.2d 403, 420 (M.D. Pa. 2008). With respect to Barnacle, Bickell, and Reed, we do not question whether they were acting within the scope of their employment in light of the allegations in Mobley's amended complaint. We do not consider Booher to have been acting within the scope of his employment, however, when he made perceived threats to Mobley in that it is inconceivable that the alleged act was at all actuated by a purpose to serve his employer, the DOC. As such, even though Mobley does not oppose this line of argument, we recommend that the Court deny Booher's defense of sovereign immunity at this stage of the proceedings.

Next, it is clear that none of the alleged acts of Bickell, Barnacle, and Reed, relevant to this claim, falls within any of the nine categorical exceptions. Moreover, this Court, more recently, has recognized that "[w]illful misconduct does not vitiate a Commonwealth employee's immunity if the employee is acting within the scope of his employment, including intentional acts which cause emotional distress. *See Iverson v. Flowers*, 2014 WL 4923173, at *6 (M.D. Pa. 2014) (citing *Mitchell v. Luckenbill*, 680 F.Supp.2d 672, 682 (M.D. Pa. 2010).Accordingly, we find that Reed, Barnacle, and Bickell are entitled to the protections of state sovereign immunity and Count XII should be dismissed with

prejudice, with respect to them. *See also, Fischer v. Pa. State Police*, No. 07–1653, 2009 WL 650251 at *12 (M.D. Pa. March 10, 2009) (holding a claim for intentional infliction of emotional distress against Pennsylvania State Police barred by sovereign immunity)

## V.    **Recommendations.**

Based on the foregoing, **WE RECOMMEND** that (1) the defendants' motion to dismiss (*Doc.* 16) be **GRANTED** in part and **DENIED** in part; and (2) Mobley be granted leave to file one final amended complaint in an attempt to correct the errors identified herein, with respect to the claims that we recommend be dismissed without prejudice.   The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen  (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate

judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **23rd** day of **June 2015**.

> ***S/ Susan E. Schwab***
> Susan E. Schwab
> United States Magistrate Judge